IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 18, 2025 Session

## CEDAR NORDBYE v. UNIVERSITY OF MEMPHIS

Appeal from the Chancery Court for Shelby County
No. CH-1345-3      JoeDae L. Jenkins, Chancellor

———————————————————

No. W2024-01483-COA-R3-CV

———————————————————

The University of Memphis initiated termination proceedings against a tenured faculty member. An administrative hearing was held before a panel comprised of four other tenured faculty members. The panel issued a report in which the majority of its members found that the university had not proven adequate cause for the faculty member's termination. The report and a record of the hearing were provided to the university's president, who disagreed and signed a letter terminating the faculty member. The faculty member sought review of the termination in the Shelby County Chancery Court. The chancery court held that the university president did not have authority to issue a decision contradictory to that of the faculty panel. The chancery court also held that the facts contained in the record did not amount to clear and convincing evidence of adequate cause for termination and ordered the faculty member be reinstated with backpay. The university appeals. We reverse and remand for entry of an order consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KRISTI M. DAVIS, J., joined.

Jonathan Skrmetti, Attorney General and Reporter, J. Matthew Rice, Solicitor General, and Matthew Dowty, Senior Assistant Attorney General, for the appellant, the University of Memphis.

Maureen T. Holland and Yvette H. Kirk, Memphis, Tennessee, for the appellee, Cedar Nordbye.

**OPINION**

# I. FACTS & PROCEDURAL HISTORY

In 2003, the University of Memphis ("the University") hired Cedar Nordbye as an assistant professor of art. As part of his duties, he was assigned the role of foundations coordinator of the art department. The foundations program is a portion of art department curriculum designed to introduce freshmen and sophomore level students to the basic components of the study of art such as drawing, composition, and art theory. As foundations coordinator, Professor Nordbye was required to teach classes focusing on several different mediums of art. Additionally, he was responsible for scheduling, staffing, developing curricula, and procuring supplies for foundations courses throughout the art department. In 2009, Professor Nordbye was promoted to the role of associate professor of art and received tenure in his position. However, beginning in 2015, Professor Nordbye's faculty supervisor, Professor Richard Lou, began to receive concerning reports regarding Professor Nordbye's behavior toward faculty, staff, and students. A string of unfortunate incidents involving Professor Nordbye followed over the ensuing years.

Sometime during the spring semester of 2015, Professor Nordbye informed Professor Lou that there was a possibility he would receive complaints stemming from his use of the "N" word in class. A student later sent an email informing Professor Lou of the incident. It appears that the "N" word was used during an in-class discussion pertaining to race without an explanation as to why it was being used. Professor Lou orally counseled Professor Nordbye regarding this incident and told him that the proper academic and educational context needed to be provided when such issues were discussed, but no formal discipline appears to have been instituted or complaint filed.

The next incident occurred in July 2015. Professor Nordbye was working as a supervising professor for a student participating in an independent study course. At some point, communication between the two broke down, and Professor Nordbye informed the student that he would receive a failing grade unless certain steps were taken to rectify the situation. The student reached out to Professor Lou to resolve the issue, requesting that the three of them meet as he felt meeting with Professor Nordbye alone would "yield no positive result." Professor Nordbye responded and informed the student that he was going to cede his responsibilities to Professor Lou and stated he did not wish to work or speak with him again. Professor Nordbye stated by email, "I was an ally before you became so disrespectful during this summer. I am no longer. This is a small art-world and I am not the only one here who has very negative impressions about you."

Shortly thereafter, an issue related to Professor Nordbye's responsibilities as the foundations coordinator arose. Professor Nordbye failed to have each of the foundations level courses scheduled and assigned a professor until very shortly before the beginning of the fall semester. This created "turmoil" and confusion throughout the department, as staff and students were not able to adequately prepare for the semester. However, it appears

that the necessary hires were eventually made.

The following December, another issue involving a second independent-study student occurred. The student disclosed certain issues to faculty members regarding Professor Nordbye's treatment of him, and they advised him to file a grievance. He informed Professor Lou of this and claimed that Professor Nordbye had made him feel "utterly humiliated" through the "highly offensive, discriminatory, disrespectful nature" of his treatment toward him. However, after discussing the matter with Professor Lou, the student decided not to file a grievance.

Around this time, Professor Nordbye was also involved in an incident involving what he described as an art "project." In November 2015, Professor Nordbye silk-screened[1] the phrase "The University of Memphis is not a business" on doors and walls around campus in response to a visiting artist being invited to lecture on campus. This constituted damage to school property and thus violated school policy. The images were removed, and Professor Nordbye was told not to silk-screen directly onto such surfaces in the future.

Another, more public, incident took place in June 2016. On June 14, Professor Lou was informed that a heated argument was taking place in the on-campus Subway restaurant. Professor Lou went to the Subway and discovered Professor Nordbye and a student shouting at one another. He was required to intervene and requested both participants to send reports explaining the incident. The matter was eventually taken up by another department of the University, but again, no formal punishment appears to have been rendered to either party.

Shortly after this incident, Professor Nordbye was again reprimanded for posting images around campus. On the night of June 30, 2016, Professor Nordbye taped silk-screened images of firearms to doors and windows around campus in response to certain Tennessee legislation that had recently gone into effect. Professor Nordbye posted the images without permission when few students and faculty were on campus. This caused a great deal of distress among the custodial staff who located the images the following morning. Professor Nordbye was reprimanded and had a very contentious meeting with the University's provost. He eventually apologized for the incident.

Subsequently, as the beginning of the 2016 fall semester approached, Professor Nordbye again had issues completing the scheduling and hiring of staff for foundations area courses. This instance was more severe, as Professor Nordbye failed to hire a professor prior to the beginning of the semester. This resulted in students attending a class

---

[1] Silk-screening is an art technique in which ink is pressed through a mesh substance that has been formed into a certain image. The ink is pressed through the mesh, often silk or another fabric, and transfers the design onto foreign surfaces.

with no instructor present. Eventually, Professor Lou "made the hires to fill the class" as he "failed to hear from [Professor Nordbye]" about the issue.

Shortly thereafter, a second incident took place at the on-campus Subway restaurant. A student reported that Professor Nordbye walked into the restaurant and began yelling at the students waiting in line to stop eating there as they were wasting their money. The student noted that Professor Nordbye was confronted by a Subway employee and responded disrespectfully, stating that the art building was "his building and he [could] do what he want[ed]."

Yet another incident took place on October 20, 2016. During that morning, the art department conducted a "spontaneous" fire drill, which required staff and students to evacuate the building. When a staff member exited the building, she noticed a large group of students gathered by the building's entrance, as well as Professor Nordbye and a student sitting at a table. She announced that the students and faculty needed to move farther away from the building, but Professor Nordbye shouted in response that, "[n]obody ha[d] to move. A brick building isn't going to spontaneously combust." The faculty member attempted to discuss the issue with Professor Nordbye, who responded, "[w]hatever," and refused to move.

Another problem arose in November 2016. As part of his responsibilities as the professor of a drawing course, Professor Nordbye was required to recruit people to serve as models for the students. A student complained to Professor Lou that his or her class did not have any models available and he confronted Professor Nordbye about the issue. Professor Nordbye responded to Professor Lou's concerns by acknowledging the issue but claiming that he had assigned the task to a graduate student who had "dropped the ball." It appears that models were eventually recruited.

In an attempt to put an end to these incidents, Professor Lou assigned Dr. Mike Schmidt to serve as Professor Nordbye's faculty mentor. This involved the pair meeting frequently to discuss goals for the improvement of Professor Nordbye's teaching and behavior. The sessions focused largely on the use of rubrics in grading, in-class organization, conflict avoidance, and time management. Despite this, concerning incidents continued to take place.

In January 2017, Professor Nordbye brought the skeletal remains of a bird to his drawing class as a model for the students. The remains were not preserved in accordance with the University's policy for such activities and there were concerns that they constituted a biohazard. Professor Lou disposed of the remains and later exerted "great effort" in order to convince Professor Nordbye to comply with policies regarding such activities in the future.

On February 16, 2017, Professor Nordbye was arrested on campus, in the hallway

directly outside of his classroom, while students were present. This arrest stemmed from an incident that occurred between Professor Nordbye and his wife. He was charged with domestic assault, but those charges were later dismissed. Professor Nordbye apologized for his "dysfunction spread[ing] into the workplace in this disastrous manner" and agreed to Professor Lou's decision to have substitute professors cover his classes the following week. Afterward, Professor Nordbye returned to his teaching duties. However, the following month, Professor Nordbye informed Professor Lou that a new warrant had been issued for his arrest but explained he planned to go "downtown and tak[e] care of it." However, he later determined that he would wait until the next day to do so, and proceeded to teach a class that afternoon, during which he informed the students of the warrant's existence. The warrant appears to have been resolved the following day, a Friday, without Professor Nordbye serving any jail time. However, Professor Nordbye was informed the following Sunday that he would not be teaching his classes during the ensuing week. He reacted angrily and argued with Professor Lou over the decision, and eventually, the classes were cancelled.

Following this incident, Professor Lou met with the students enrolled in Professor Nordbye's various classes and asked them about their experiences. The notes reflect that the students were largely critical of Professor Nordbye's teaching. Students described him as "harsh" and "caustic" when critiquing their work, claiming he characterized students' work as "stupid or childish." Many students also commented on Professor Nordbye's lack of organization and structure in class and many stated that they had not received any grades for their work. Professor Lou compiled a report of these conversations, which he provided to the University's provost and the dean of the art department.

Meanwhile, Professor Nordbye's arrest led to another unfortunate incident between him and a student. The student created stickers featuring Professor Nordbye's mugshot and captioned "Cedar the beater." The student then distributed the stickers around campus. Professor Nordbye learned of this and used his university email account to threaten legal action against the student unless he collected and turned in the stickers. Professor Lou reprimanded Professor Nordbye for using his university email account to do this, explaining that it violated the University's policy regarding email use and any violation of the student code which may have occurred should have been referred to the University's "Student Conduct" office.

In the wake of these incidents, a meeting was scheduled for April 10, 2017, in which Professor Nordbye, Professor Lou, the dean of the art department, and the associate dean of the art department were to conduct an annual faculty evaluation. Professor Nordbye failed to appear at the scheduled time. The other participants waited for a time and then called Professor Nordbye. Professor Nordbye answered and stated that he had "just woke up." He initially agreed to meet at a later time but then became angry. He began yelling and eventually ended the call. He arrived later and met with the other participants. During that meeting, the participants reviewed Professor Nordbye's faculty evaluation, which

noted he had failed to meet the minimum responsibilities of his position.  The evaluation noted that Professor Nordbye had agreed the previous year to work to improve his teaching but "[t]hat did not happen" as he "continued to over commit[ ]" to extraneous activities.  The evaluation also noted that, in addition to the incidents outlined above, Professor Nordbye had become "distracted [from his] primary job as teacher and coordinator" by his decision to undertake mural painting and noted his failure to properly recruit staff for various foundations positions and recruit models for his drawing classes.  He was then informed that he would not teach for the remainder of the semester and was permanently removed from his position as foundations coordinator.

Professor Nordbye's receipt of a faculty evaluation stating that he had "fail[ed] to meet responsibilities" triggered certain protocol pursuant to the terms of the handbook which required the creation of an ad hoc committee to review the evaluation.  The committee determined that Professor Lou had been fair when conducting his evaluation.  Accordingly, Professor Lou developed a performance improvement plan over the summer and presented it to Professor Nordbye.  Further, while his meetings with Dr. Schmidt had paused while Professor Nordbye was not teaching and during the summer holiday, they resumed in August 2017.  Dr. Schmidt informed Professor Lou that Professor Nordbye held a great deal of resentment and anger toward him and advised him not to meet with Professor Nordbye alone.

Despite the existence of the performance improvement plan and his mentorship with Dr. Schmidt, yet another concerning incident occurred in September 2017.  Professor Lou was informed that Professor Nordbye had removed a sink from his classroom.  Professor Lou went to Professor Nordbye's classroom and discovered that the sink had indeed been removed.  Professor Lou confronted Professor Nordbye, and another argument ensued.  Shortly thereafter, Dr. Schmidt resigned as Professor Nordbye's faculty mentor, explaining that while some progress had been made in the use of rubrics and syllabi, he did not have the training necessary to deal with Professor Nordbye's personal issues.  Professor Nordbye was placed on administrative leave on October 9, 2017, pending the completion of a fitness-for-duty examination.

The examination was completed during the following November.  On December 22, 2017, Professor Nordbye was sent a letter informing him he had been deemed unfit for duty and was being terminated.  However, Professor Nordbye challenged the termination in federal court.  As a result of an undisclosed settlement between the parties, Professor Nordbye returned to his position as a tenured professor pending a hearing.  On December 3, 2018, the University sent Professor Nordbye a new letter informing him that it would be pursuing his termination based on "adequate cause" pursuant to Tennessee Code Annotated section 49-8-302, rather than fitness for duty.  The letter alleged that Professor Nordbye had engaged in conduct constituting the following types of adequate cause for termination: (1) incompetence or dishonesty in teaching or research, (2) willful failure to perform the duties and responsibilities for which the faculty member was employed; or refusal or

continued failure to comply with the policies of the University, or department, or to carry out specific assignments, when these policies or assignments are reasonable and nondiscriminatory, (3) capricious disregard of accepted standards of professional conduct, and (4) failure to maintain the level of professional excellence and ability demonstrated by other members of the faculty in the department or division of the institution. *See* Tenn. Code Ann. § 49-8-302. Professor Nordbye later received a letter informing him of the specific instances of conduct that the University deemed to constitute adequate cause for termination, as well as the date and time of an administrative hearing.

Meanwhile, the University formed the President's Panel, a body of tenured faculty members tasked with presiding over the adequate cause hearing. The panel consisted of four tenured faculty members as required by the University of Memphis Faculty Handbook. The handbook provides that the panel is to conduct an administrative hearing and "determines if adequate cause for termination [of the faculty member] exists[.]" In accordance with Tennessee Code Annotated section 49-8-303(a)(4), the University carries the burden of proving that adequate cause exists by clear and convincing evidence. Notably, the panel is not constrained by the traditional rules of evidence but "may admit any evidence which is of probative value in determining the issues involved." After the hearing, the handbook requires the panel to generate a report "specify[ing] findings of fact and [stating] whether the committee has determined that adequate cause for termination exists." The report is then provided to both the faculty member and the University's president. At the time of these proceedings, Dr. David Rudd was serving as the University's president. After considering the report and the record of the administrative proceedings, the president is then charged with "reaching a final decision regarding termination" and notifying the faculty member of that decision, "which, if contrary to the committee's recommendation, shall be accompanied by a statement of the reasons." The hearing on this matter took place over the course of several non-consecutive days between March 2019 and May 2019. Both the University and Professor Nordbye were represented by legal counsel.

The University called Professor Lou to testify. Professor Lou worked as a professor in and chair of the University's art department and was Professor Nordbye's supervisor for approximately ten years. Professor Lou discussed several of the incidents and behavior that led to Professor Nordbye's termination. First, Professor Lou testified regarding the conflicts between Professor Nordbye and the two independent study students. As to the first student, Professor Lou explained that Professor Nordbye sent several emails that reached levels of "inappropriateness in regards to blaming the student" for the conflict that had occurred. Professor Lou stated that he spoke to the student regarding the incident and took over the course because Professor Nordbye stated he could no longer be impartial when dealing with the student. Professor Lou stated that the student was cooperative and completed his work without issue. He noted that the most concerning issue stemmed from Professor Nordbye's subsequent email. Professor Lou stated that this email was a "not so veiled threat" by Professor Nordbye that was "completely out of the bounds of professional

conduct." He later explained that he viewed the comments as a threat that Professor Nordbye "could impede an artistic career by this student" based on his negative impressions and the "small art world" in which the student would work. Professor Lou also discussed the second incident involving a student participating in an independent study course. Professor Lou stated that he spoke to two other professors who had advised the student to file a grievance against Professor Nordbye based on "how this student had been treated" as it was "alarming." Professor Lou explained that other faculty members recommending a student take such a step was "highly unusual." However, he met with the student and apologized for Professor Nordbye's behavior. He informed the student that he would "facilitate" independent courses with other professors, and the student decided to refrain from filing a grievance. He also discussed the argument Professor Nordbye had with a student in the on-campus Subway restaurant. He noted that after intervening, he asked Professor Nordbye and the student to each write a report about the incident. He stated that the "reports weren't written for a long time," and the matter was eventually turned over to another department of the University. He also recounted the incident in which Professor Nordbye reported having used the "N" word during class. He stated that Professor Nordbye informed him that "there might be some complaints" because he had done so. Professor Lou stated that he explained to Professor Nordbye that while it is permissible to discuss such topics and use such language in an educational setting, he needed to provide the proper context for use of the term so that the students learned something instead of merely "hear[ing] the word and be[ing] shocked."

Professor Lou also testified regarding Professor Nordbye's struggles to perform his duties as a professor and foundations coordinator. He reviewed several emails from August 2015 that concerned Professor Nordbye's issues scheduling classes and assigning staff for foundations level art courses. Professor Nordbye was very late in returning the schedules, and Professor Lou explained that this caused "a lot of turmoil" within the art department as it prevented students and teachers from properly preparing for the semester. Professor Lou stated that the following year, Professor Nordbye failed to hire staff for a certain class, and the students met without a professor. Professor Lou described this as "illustrative of a pattern that ha[d] always been there" with Professor Nordbye and explained that he eventually had to hire the staff member himself. Professor Lou also reviewed a May 2016 email Professor Nordbye sent regarding his faculty evaluation for that year. In the email, Professor Nordbye recognized that he had not reached his full potential as a teacher in part due to "disorganization and also a spontaneity." He acknowledged that he lacked focus in his course work and intended to use more structure moving forward as well as reducing the number of courses and committees on which he was to serve. Professor Lou noted that he requested Professor Nordbye "no longer take on so many extracurricular activities" so he could focus on improving his teaching and organization. Despite this, Professor Nordbye later began "mural painting," which, according to Professor Lou, "created havoc in [the art department]" because Professor Nordbye could not or would not "keep his accounts straight in regards to vendors charging" for materials used to create the murals. Professor Lou noted this was after they had "talked about how he needed to not take on giant tasks"

in order to focus on teaching effectively. Professor Lou stated that he later performed classroom observations and reviewed student evaluations. Afterward, he determined that Professor Nordbye had not met the goals set forth in the May 2016 email. He acknowledged that he had assigned Professor Nordbye some committee work after the discussion but explained he did so due in part to Professor Nordbye's experience with a particular art medium, and because the other committee was tasked with searching for a foundations position which would fall under Professor Nordbye's supervision. In addition to these issues, he stated that Professor Nordbye missed several departmental meetings without notifying him. He also noted the incident in which Professor Nordbye failed to schedule people to serve as models for a drawing class. Professor Lou stated that these incidents left him concerned Professor Nordbye was "not fulfilling his obligations as foundations coordinator or as a colleague."

Additionally, Professor Lou discussed the incidents in which Professor Nordbye posted silk-screened images of a firearm around campus and silk-screened the phrase "The University of Memphis is not a business" directly onto university doors and walls in response to a guest speaker lecturing on campus. He stated that the firearm images had left many custodial staff-members apprehensive and fearful. Nonetheless, Professor Nordbye rationalized the behavior and did not "learn anything" from the incident. He stated that while the images could be considered art, they were more so a "self-indulgent gesture [rather] than a dynamic form of political protest." As to the "The University of Memphis is not a business" incident, Professor Lou stated Professor Nordbye did this without permission and that it constituted damage to state property.

Professor Lou also discussed the events surrounding the fire drill incident. He stated that the professor who had asked Professor Nordbye to move was the "floor-captain" in charge of ensuring that a certain floor of the building was properly evacuated in cases of emergency. He noted that Professor Nordbye made "flippant" remarks to the other professor and refused to move. Professor Lou stated that this incident led him to seek counsel from human resources in order "to get the appropriate tools necessary to help support Professor Nordbye." He then made the decision to assign Dr. Schmidt to serve as Professor Nordbye's faculty mentor in the fall of 2016. Nevertheless, Professor Nordbye brought the skeletal remains of a bird into class. Professor Lou noted that the remains being brought to campus outside the University's regulations rendered them a biohazard. However, he explained that the issue did not stem from Professor Nordbye bringing the remains in as a model, but rather from his failure to follow protocol and safety guidelines when doing so. He noted that Professor Nordbye sent several "belligerent" emails after the incident, which were a source of disappointment, and stated it took "great effort" to convince him to agree to comply with the University's policy. Professor Lou maintained that Professor Nordbye argued with him about the incident by claiming that bringing in the remains "was safe because he had put [the remains] in a condom."

Professor Lou also discussed the events surrounding Professor Nordbye's arrest and

the arrest warrant issued the following month. He stated that after Professor Nordbye's first arrest, he told him to take some time away and allow substitutes to teach the following week. Professor Nordbye agreed and was apologetic for the incident. However, Professor Lou was greatly concerned by Professor Nordbye's later decision to teach his class despite his knowledge of a second active warrant for his arrest. He deemed it to be "completely unprofessional [and] inappropriate" to announce to his students that the warrant existed and stated it thwarted the art department's goal of creating a "nurturing learning environment." Further, he and Professor Nordbye argued when he scheduled substitutes for the following week. He stated that he told Professor Nordbye multiple times to "just take the time off," but he responded "nope, I'm coming" and stated if a substitute faculty member did attend class he would "co-teach." This resulted in the classes being cancelled. Professor Lou stated that afterward, he went to Professor Nordbye's classes to obtain feedback from students. The students consistently indicated that they had experienced issues in the class and had learned little. He discovered that many had not been assigned grades at what was a very late point in the semester. He explained that this was "highly unusual" and violated a department policy that required foundations students receive a mid-term grade. However, on cross-examination, Professor Lou acknowledged having received copies of several emails from Professor Nordbye in which he informally assigned grades to various students who had inquired about their grades. He later acknowledged that he had not gone "back to look to see what had been submitted in any course ware" for Professor Nordbye's courses.

Professor Lou noted that, in the midst of Professor Nordbye's arrest and subsequent warrant issue, a student created stickers depicting Professor Nordbye and the domestic incident leading to his arrest. He explained that the email Professor Nordbye sent threatening legal action was sent from his university address. He had to involve the University's legal department to explain the "power dynamics" involved as well as the creation of a perception "that [his] position was the University's position." Shortly thereafter, Professor Nordbye overslept the meeting scheduled for April 10, 2017. Professor Lou stated that when they called and woke Professor Nordbye up, he became very angry and "yelled at us over the phone and then he slammed the phone or he hung up on us." However, he stated that when Professor Nordbye later came to the rescheduled meeting, he "behave[ed] himself" and asked "[w]hat do I need to do to keep my job?" Professor Lou responded that he needed to listen to him as the department chair, and he then informed him that he would not teach his classes for the remainder of the semester and was being removed from his position as foundations coordinator. Professor Lou stated that he later created a performance improvement plan, but when Professor Nordbye was presented the plan, he "appeared to be confused" as to why he was receiving the plan and then "tosse[d]" the plan back to Professor Lou stating, "this doesn't really pertain to me." However, he later accepted the plan.

Lastly, Professor Lou discussed Professor Nordbye's removal of the sink from his classroom wall. He first learned of the incident because another faculty member reported

- 10 -

that Professor Nordbye had "bragged" about doing so. He noted that Professor Nordbye had previously engaged in similar behavior and accordingly, his performance improvement plan had included specific language stating he was to have respect for property. He maintained that when he confronted Professor Nordbye about the sink, they argued. Professor Nordbye claimed that he had the right to remove the sink because it was in his classroom. Professor Lou responded that the sink was state property and therefore, Professor Nordbye had "no authority to remove" it. Professor Lou stated that Professor Nordbye later admitted to removing the sink in part because he was angry at him. On cross-examination, Professor Lou acknowledged that faculty do make physical alterations to their classrooms from time to time and he had been involved in some such alterations. However, he maintained that he had done so "after [he] sought permission."

Dr. Karen Weddle-West was the next witness called to testify. She worked as the provost for the University of Memphis at the time in which the incidents involving Professor Nordbye occurred. She discussed the incident in which Professor Nordbye posted images of firearms around University buildings. She stated that it took "hours" for Police Services to determine who had posted the images but eventually, "they concluded that Cedar had placed the guns" and asked her to "have a conversation" with him about the incident. She stated that the images caused great fear among the custodial staff who had discovered them. She met with Professor Nordbye about the incident and noted the lengths to which he went to justify his actions. The two had a long and contentious conversation, and she informed Professor Nordbye that he needed to apologize to those who were alarmed by the images. She also noted that the incidents involving Professor Nordbye had caused students to become distressed, and the performance improvement plan had been designed to fix those issues. She stated that students began to feel "uncomfortable" with Professor Nordbye because he demeaned and belittled their work, did not grade properly, and failed to stay "on task." She stated that students felt "they weren't getting what they paid for, which was to learn in a healthy, helpful, learning environment." She also recounted the incident in which Professor Nordbye removed the sink from his classroom. She described this act as "incredulous." She noted that Professor Nordbye had been "told on several occasions, not just by [her] but by others the University is not [his] house" and he could "put up gun prints all over [his] house but [he] [could not] do it here." She later explained that Professor Nordbye had previously been told that he needed to seek permission prior to removing things from his classroom and that "[e]very other faculty member, every other staff member seeks permission" before doing such things. She stated that, in her opinion, Professor Nordbye's presence on campus posed a danger and threat of destruction to the academic or operational processes of the institution.

The University also called Dr. Tom Nenon to testify. Dr. Nenon took over as the University's provost after Dr. Weddle-West and signed Professor Nordbye's termination letter while she was on sick leave in December 2017. Dr. Nenon explained that he did not have much personal knowledge regarding the incidents involving Professor Nordbye, but he was familiar with Professor Nordbye's student evaluation of teaching effectiveness

("SETE") scores. He explained that these are voluntary "student surveys" that can be used to identify and correct perceived deficiencies. He stated that Professor Nordbye's SETE scores struck him "as particularly low for the University of Memphis." He later explained that SETE scores can be a reliable measure of a professor's performance so long as they are placed into the proper context and patterns are reviewed rather than individual scores. Later, the University called Karen Bell, the University's director of web and mobile services, to testify regarding the comments written by students who had completed SETEs for Professor Nordbye's classes. She stated that she had reviewed the SETE reports and had never seen a set of comments that were so "consistently critical" of a professor. Many of the comments concerned Professor Nordbye's interactions with students. One comment noted that Professor Nordbye would "bicker with students" while another stated that his "immaturity made this class unbearable" and noted that "[g]irls cried." Several comments pertained to Professor Nordbye's lack of organization. Some of these included comments stating that Professor Nordbye would arrive at class and "say he didn't know what we were doing that day" or would discuss "tv shows, cats, and very unimportant topics." Another such comment noted that Professor Nordbye often went on "tangents that didn't really have anything to do with the course." Many students commented on his overly harsh and arbitrary criticisms, while others noted a lack of grades. One student noted that on a day that was set aside for critiquing student work, they instead "pulled a cherry picker up a flight of stairs and made carrot juice." Another student noted that even when critiquing student projects, Professor Nordbye would lose focus and the class would "NEVER get through seeing every student project because [Professor Nordbye] stray[ed] off topic when talking about one project." Another student stated that "[c]ritiques were terrible. Too long – several days – and we didn't even get to everyone." The student also noted that many students "made projects only to please [Professor Nordbye's] weird idea of art" and "were scared of being put down in front of their classmates" as Professor Nordbye "would say really rude and hurtful things" including telling "one girl she should never paint again." Although the comments were not exclusively negative, the negative comments outweighed the positive, and many students who wrote positive comments would nonetheless comment on his issues as an instructor.

Professor Nordbye's faculty mentor, Dr. Mike Schmidt, also testified. He noted that he had never served as a mentor to a tenured faculty member before because the department "never had in the 25 years [he had worked there] a tenured faculty member who was in a situation where his employment was in peril." However, he served as a mentor to junior faculty members on various occasions. He generated a plan with the help of Professor Lou that was intended to help Professor Nordbye improve his teaching and behavior. He served as Professor Nordbye's mentor from January 2017 until October 2017 and created a mentoring plan outlining the objectives of the relationship. He noted that Professor Nordbye did make some improvements and implemented a grading rubric. However, concerning incidents persisted. He stated that he often had to remind Professor Nordbye not to discuss his personal life during his classes, and they often discussed his issues balancing his teaching and foundations coordinator responsibilities with his various

extracurriculars such as working on mural projects. He noted that Professor Nordbye had a tendency to take on too many projects and did not manage "scope creep" properly.[2] He explained that Professor Nordbye was removed from his coordinator position before they were able to make any substantive progress on certain goals pertaining to that role. Afterward, Professor Nordbye's frustrations with being removed from his coordinator position "spilled over on the mentoring sessions."

Dr. Schmidt stated that his plan also focused on helping Professor Nordbye avoid conflict. One strategy he attempted to implement involved Professor Nordbye sending him emails prior to sending them to the intended recipient so Dr. Schmidt could make suggestions. However, Professor Nordbye only did this once and began sending Dr. Schmidt emails only "after the fact." Dr. Schmidt stated that Professor Nordbye would acknowledge his responses were often "over the line." As for face-to-face conflict, Professor Schmidt focused on the arguments that Professor Nordbye would engage in with Professor Lou but he "just couldn't get anywhere with it." On one occasion, he assigned Professor Nordbye a "planned behavior exercise" that he completed prior to their meeting. However, he later failed to complete similar exercises.

Professor Schmidt stated that Professor Nordbye would become very angry when discussing Professor Lou. As a result, he sent Professor Lou an email advising him to "proceed cautiously" when meeting with Professor Nordbye and to not do so alone. He stated that, at one point, Professor Nordbye informed him he struggled with anger management. He recounted one incident in which Professor Nordbye had been asked to author a description of the foundations program for the University's website. He wrote a "real copy" that he sent to the web administrator but also wrote another version riddled with criticisms of the art department and self-aggrandizing statements, which he sent to Professor Lou. Additionally, Professor Lou had asked to be sent the description first but Professor Nordbye "bypassed him" and sent it directly to the web administrator. Dr. Schmidt stated that these events clearly demonstrated Professor Nordbye was not avoiding conflict or communicating professionally. He determined that they were making no progress and informed Professor Lou that he wished to resign.

Professor Nordbye also testified. Professor Nordbye acknowledged that complaints regarding his teaching style persisted throughout his time in the art department. He stated that at one point, the department chair before Professor Lou told him he that he should consider working elsewhere because the students at the University were not "going to appreciate what [he was] doing." He stated that he came to understand this meant his teaching style would be more appreciated at a liberal arts college where the students wanted "rigor" and "philosophy" and would "eat [it] up." He found that as "a lot of students are coming from Memphis high schools, [they were] not used to it[.]" Based on these

---

[2] Dr. Schmidt described scope creep as projects "taking on a life of their own and getting bigger and bigger and bigger" to the detriment of a person's additional responsibilities or projects.

observations, he came to realize that he "would have some mixed results from student responses" and "students wouldn't always be happy to do the things that [he] was asking them to do." He later stated that there were some students who would not "want to go there or [weren't] willing to have faith that [his] rambling or [his] improvisation or [his] spontaneous ideas [were] in this search of something higher, they can be frustrated by it." He claimed that this is why he appeared to be disorganized but also claimed Professor Lou encouraged him to maintain this style. However, he admitted that Professor Lou did ask him to address his class organization. He felt that his time with Professor Schmidt had largely remedied those issues and he had been "on top of [his] game" immediately prior to his termination. Professor Nordbye also discussed his grading policy. He stated that he felt grades were often "insufficient" to evaluate a student's progress. However, he implemented a new rubric after he began working with Dr. Schmidt that he felt helped mitigate those issues. He also stated that he never failed to have grades turned in, though he did "de-emphasize" them and knew of students who wished he would grade more often. He noted that another professor in the department did not grade until the end of the semester and he claimed the decision to do so was a component of academic freedom. He also took issue with Dr. Lou's decision to speak to students after his arrest, claiming that it was not fair to do so. He also believed that the students' responses were not indicative of his normal teaching abilities as it came during a turbulent time for him personally.

Professor Nordbye acknowledged that he was encouraged to "cut back" on certain activities. He agreed to do so but claimed that Professor Lou assigned him classes outside of his practice area despite these conversations. However, he was not assigned any classes outside his area after 2016. Likewise, he agreed to reduce his committee work, but Professor Lou subsequently assigned him to multiple committees.

Professor Nordbye also discussed his mentorship with Professor Schmidt in detail. He stated that Professor Schmidt helped him overhaul his grading rubric and his syllabus and also recommended he conduct a student survey. He noted that these items were all helpful but there were "negative" aspects of the relationship. This included Dr. Schmidt's reactions to his attempts to discuss his "emotional life," which "led others to have concerns that were unnecessary." He claimed that he sent several angry emails to Dr. Schmidt as part of the email review system, but they were never intended to go to Professor Lou, only serve to get his feelings "off his chest." He explained that his anger at Professor Lou "was the kind of anger that one has towards a family member where there is love" because he viewed him as family. He further stated that the anger issues he referenced to Professor Schmidt really consisted of an "indignation streak" because he detested "injustice." He clarified that he was not emotionally unstable but noted a perceived injustice would "provoke[ ] intense feelings and sometimes intense responses." He claimed that he had been under the impression the information he shared with Dr. Schmidt would be used to help "channel" those feelings into "professional and . . . functional and productive communication" between himself and others.

He discussed the incident involving the posting of images of a firearm around campus and explained that it had been a protest of certain legislation enacted by the Tennessee Legislature. He claimed that it had been an art "project" and he had not signed the images to prevent attention from being placed on himself. He also claimed that he had not been hostile or belligerent during the ensuing meeting with Dr. Weddle-West. He viewed the discussion as "productive" but did acknowledge that he could "understand how [Dr. Weddle-West] might have seen it as disrespectful or somehow threatening." He claimed that he had not intended for the images to be threatening but acknowledged there had been some "unintended consequences" rendering the "project" less successful than desired. He apologized to the custodians and police services, but said "it didn't seem like anyone thought it was a big deal."

Professor Nordbye also discussed the events surrounding his classroom arrest and the second arrest warrant issued the following month. He stated that, when he was arrested, he did not know the warrant existed. He stated that the arrest stemmed from a conflict with his wife. He was arrested "in the hallway outside [his] classroom but with the door open and [his] students in the classroom." He did not know that he was going to be arrested, and stated that had he known, he would have turned himself in and avoided the "embarrassment . . . and disruption that took place." He explained that the second warrant was issued based on the violation of a restraining order. He stated that the violation stemmed from his sending gifts to his son at the marital home. He claimed that he did not realize this would violate the restraining order but was later informed by his lawyer that the "prosecution in that criminal case . . . had said that there might be a new charge" against him. His lawyer advised him to monitor the sheriff department's website. He did so, and eventually a warrant for his arrest was issued. At that point, he informed Professor Lou that he intended to go downtown that day to resolve the issue. However, his lawyer later advised him to wait until the next day, so he taught his afternoon class instead. He claimed that someone from Dr. Schmidt's office called him into the hallway to discuss the issue during his class. When he returned to class he explained the situation to the students. He stated that he told the class because he needed to "manage the emotional chemistry of the room." He went and "took care of" the warrant the next day, which was a Friday. However, he did not speak with Professor Lou until the following Sunday, at which point, he learned that substitutes had been scheduled for his classes throughout the ensuing week. He stated that he "really objected" to this as it triggered "that indignation or the feeling of injustice" as he "really felt like [his] rights as a faculty member were being impinged upon by the decision to have those substitutes[.]" He stated that he wanted the class to succeed and to avoid interruptions and also to demonstrate "how strong [his] teaching [could] be." Professor Lou later cancelled the classes. He was subsequently informed that he would not be teaching the remainder of the semester.

Professor Nordbye noted that the performance improvement plan was created over the following summer and stated he welcomed the plan as it contained many goals related to things upon which he had already started working and it could "ultimately be useful."

- 15 -

However, there were some items he felt "might not be as specifically useful for [his] development." Nevertheless, he contended that he complied with the plan by (1) reflecting on his goals, (2) increasing his email presence with students, and (3) responding more quickly to faculty emails. He stated that these efforts helped resolve many of the issues that had hindered him and he "experienced an elation" during the fall of 2017 that made him "feel more confident and happier in [his] job than [he] been in a long time." He stated that he had begun to feel more "ownership" of the campus and University and wanted to help improve them. He claimed that, as a result, he decided to remove the sink in his classroom in order to "have more space for teaching." He explained that the sink at issue was not in use because the room contained another sink that was "industrial" and more well suited for cleaning art supplies. He also explained that he had construction experience working on his father's crew and for charitable organizations. He claimed that he had done similar things to other portions of the building but noted he had obtained permission to do so. He stated that he was not sure where the rumor that he removed the sink out of anger came from, but when Professor Lou confronted him, he apologized. However, he was then placed on administrative leave pending a psychological evaluation. He stated that he was eager to complete the evaluation and return to teaching, but the evaluation did not occur until November. Shortly thereafter, he was informed that he was no longer fit for duty and was being terminated. This resulted in his initial legal challenge, his later reinstatement, and the initiation of these proceedings.

Professor Nordbye gave his perspective on several of the other incidents listed in the termination letter. He began with the incident in which he yelled at the students in the on-campus Subway that they should bring food from home and the ensuing confrontation with a worker. He stated that he noticed students would complain about not having money for art supplies but would often eat at Subway during class breaks. He said it struck him that he did not eat out often while in college and became "inspired" regarding the campus food system based on a book he read. He began discussing new food system options with officials from the University. He stated that he began to make soup at home and passed it out on campus for free and later told his students to collect magnolia leaves and attempt to sell them to people as an economics project. He did not explain how passing out soup or the magnolia leaves project related to his confrontation in the campus Subway or recount what took place or was said. Next, he discussed bringing the remains of a bird into his classroom. He stated that he noticed birds dying on a particular property adjacent to his local park due to a piece of plywood leaning against a window "so the whole window was covered with bird skeletons." He notified the property owner to try and have the condition changed. He stated that he "retrieved those bird skeletons" and brought "the skull into the class to talk about [his] effort to save th[o]se birds" and "partly as a way of modeling to [his] students a way that our artistic activities can spill into our sort of civic involvement or our care for animals or the environment." He did not deny having failed to follow the University's procedures for bringing such models onto campus. Next, he discussed the email exchange with a student that Professor Lou described as a "veiled threat." He stated that he did not intend for that message to be a threat but a warning "that some of his attitudes

[were] going to cause . . . harm in his interactions with his peers in the future[.]"  As for the second independent study student, he merely claimed that he was "mystified" by what the problem was and did not "know what he took offense to."  He also discussed his failure to recruit models for a drawing class.  He admitted that he failed to do so but stated it was also the fault of the graduate student to whom he had delegated the task.  He stated that they were later able to rectify the situation.  As for the fire drill incident, he did not deny it but merely claimed that the professor who had asked him to move was "a person who ha[d] often made sweeping statements and overstated things to an extreme degree to make people seem like they were transgressing" and would look "for anything to make a fight."  He also discussed his use of a university email address to threaten a student with legal action.  He stated that his only goal had been to convince the student to stop distributing the stickers.  He stated that he later understood why it was problematic for him to use his university email to do so and admitted he had "been a bit naïve about university email prior to that" as "there could be a voice of authority that comes with an email that is sent from that system[.]"

Professor Coriana Close also testified.  She had worked as a photography professor in the art department since 2011.  She was asked whether professors had ever made any changes or improvements to art department space.  She stated that she had previously altered her own office by painting it yellow.  Additionally, she recounted an occasion upon which Professor Lou tasked Professor Nordbye with "putting up homasote all over the building" using a "driver" to "drive long screws" into cinderblock walls.[3]  She further claimed that the staff had never been informed of or practiced what to do during a fire drill.  She similarly claimed that she was unfamiliar with procedure for furnishing classrooms with animal remains as models, but claimed it was a common practice.  She had not found it "odd" that Professor Nordbye had done so.  She stated that there were several human and animal skeletons available for drawing.  She recounted one incident in which a student had created "a small installation in the sculpture building in which she had an entire rat king, and that's when rats all died tied up together because . . . they were jammed up."  She stated that, "[n]obody said anything" about the sculpture violating the University's policies.

On July 1, 2019, the President's Panel issued its report.  The report stated that the panel "found, in a vote of 3 to 1 in favor of Professor Cedar Nordbye, that there [was] no adequate cause for termination."  The majority further "recommend[ed] to the President that in lieu of termination, Professor Nordbye be placed on a three-year performance improvement plan as described in [the handbook]."  The remaining member opined that adequate cause had been proven and termination was an appropriate punishment.  The panel submitted its report to President Rudd, who reviewed it and the record.  On August 22, 2019, President Rudd signed a letter informing Professor Nordbye that "[a]fter a thorough evaluation of the matter, [he had] determined that there [was] adequate cause for termination" based on a willful failure to perform the duties and responsibilities of a faculty

_____

[3] Homasote is a brand of fiberboard used for displaying art.

member, a capricious disregard of accepted standards of professional conduct, and a failure to maintain appropriate levels of professional excellence and ability.

Shortly thereafter, Professor Nordbye filed a petition for judicial review in the Shelby County Chancery Court. The petition sought review "pursuant to TCA 49-8-304 [of] the University's wrongful and illegal final decision to dismiss/terminate Professor Nordbye's tenure."[4] The petition also claimed that President Rudd's decision to override the President Panel's decision was contradictory to the terms of the handbook and violated Professor Nordbye's due process rights. The University maintained that adequate cause had been proven by clear and convincing evidence. The University also argued that Professor Nordbye's procedural arguments were without merit because President Rudd was permitted to make a decision contrary to that of the panel, but even if he had not been, any error would be cured by *de novo* review in the chancery court.

Early in the proceedings, the chancery court entered an order noting that it would accept additional evidence proffered by the parties. The University submitted several additional exhibits that each pertained to the incidents discussed throughout the administrative hearing. These exhibits included several emails demonstrating Professor Nordbye's struggles to complete his assigned work or reduce his extracurricular activities. The first email was sent from Professor Nordbye to Professor Lou while trying to schedule a meeting with President Rudd. In the email, Professor Nordbye stated that he was going to "try to put a period of belligerence behind [him]." Another strand of emails was exchanged after Professor Lou asked Professor Nordbye to reduce his committee work. In one email, Professor Nordbye stated that he "did not take [Professor Lou's] advice to be an order." Professor Nordbye apparently refused to even reduce his committee work by taking reduced roles while staying involved with committees. One email sent by Professor Nordbye in August 2016 featured him seeking to form a new committee "with a mission to bring public artworks into the neighborhoods surrounding the University of Memphis."

Several emails also demonstrated Professor Nordbye's disrespectful demeanor towards Professor Lou and other members of the art department. One set of emails pertained to Professor Nordbye's failure to have teachers assigned to various foundations classes. When Professor Nordbye responded, he claimed that he had several events ongoing and issues with the electricity at his house. Professor Lou's response noted that he and another department member had scheduled a meeting with Professor Nordbye and waited more than 30 minutes for him to arrive, but he never appeared or informed them he would not be attending. Professor Lou informed Professor Nordbye that, in his view, his issues "aside from the personal" involved a "conflict of priorities." He explained that

---

[4] The petition levied additional claims based on the violation of Professor Nordbye's constitutional rights and breach of contract. However, the University filed a motion to dismiss these "ancillary" claims, and the parties eventually consented to the entry of an order by the chancery court that dismissed these claims without prejudice.

Professor Nordbye's primary responsibilities involved teaching and supervising foundations level art courses. He noted that he had received an invitation to join Professor Nordbye's new committee, and maintained this was an example of Professor Nordbye "spreading [him]self so thin" that he could not effectively carry out his primary job functions. Several other emails were included that demonstrated Professor Nordbye's contentious interactions with other department staff. In one such email, Professor Nordbye and another professor had a disagreement regarding the use of classroom space. The professor told Professor Nordbye that, while there were problems with the foundations program, he should not blame his room assignment and "[m]ake better use of the facilities" that were already available. Professor Nordbye responded: "[p]lease retire." Professor Lou reprimanded Professor Nordbye and told him that "this needs to stop" because such "rhetoric between colleagues [was] unacceptable[.]" Professor Nordbye responded: "[w]hy?" Afterward, Professor Lou directed Professor Nordbye to not attend a faculty meeting as it would require a "high level of collegial interaction." Professor Nordbye responded: "[a]wesome, thank you!" Professor Nordbye later sent an email apologizing. He acknowledged that his behavior had not been "professional" and "realize[d] that it was also toxic behavior and that it was an immature response to serious issues[.]" Additionally, an email was submitted concerning Professor Nordbye's removal of the sink. Professor Nordbye apologized for his reaction and stated that he understood "how [Professor Lou] would be upset about it on several levels." He noted that it "ma[de] sense" for the incident to cause concerns "of a continuing pattern of transgressing boundaries." He stated that he "knew that [he] was crossing a boundary with the sink thing" and understood his mistake.

Meanwhile, Professor Nordbye sought to depose President Rudd regarding his decision to override the decision of the President's Panel. The University objected, claiming it was unnecessary as the University's policies "speak for themselves." The chancery court determined that, while President Rudd's testimony would likely not be relevant, the testimony of a designee might, and that "testimony on those topics [could] be obtained through a deposition pursuant to Tenn. R. Civ. Pro. 30.02(6)." As a result, Dr. Thomas Nenon was deposed. He was still serving as the University's provost and as its executive vice president. Dr. Nenon noted that he had spoken to President Rudd while he was considering the panel's report. He stated that President Rudd made an independent decision regarding termination, but he did generally take the opinions of others into account when making such decisions. He stated that the panel had only been empowered to make a "recommendation," but not a "decision." He stated that the report was considered very seriously, but the ultimate power to manage the university and ensure safety was the responsibility of the president and could not be delegated. He stated that he spoke to President Rudd about his reasoning, and his disagreement with the panel majority stemmed largely from the view of certain actions as performance issues whereas President Rudd viewed them as misconduct. He stated that President Rudd "recognized that the University [could] not simply allow abusive behavior for three years while encouraging the faculty member to please stop it" because the behaviors at issue were "unacceptable and needed to be stopped immediately[.]" He noted that performance issues and misconduct are

- 19 -

addressed in different ways. However, he acknowledged that President Rudd was aware of and considered incidents and information not contained in the administrative record.

The hearing in chancery court took place over the course of two days in February 2023. Both sides presented additional legal arguments. Additionally, the University was permitted to recall Professor Lou in order to provide additional testimony. However, Professor Nordbye's counsel levied several successful objections during this testimony that left little if any relevant information admitted. The chancery court specifically stated that it would not permit the "taking of any evidence at this point that [went] to what may have occurred after the termination[.]" As a result, the testimony was largely excluded as evidence.

More than one year passed without a final order being entered. At that point Professor Nordbye filed a motion requesting the chancery court to enter a ruling. The chancery court entered an order reinstating Professor Nordbye and awarding him backpay on August 28, 2024. The chancery court found that the termination violated Tennessee law and the faculty handbook. The court held that President Rudd did not have the authority to overrule the decision of the President's Panel and also held that there was not clear and convincing evidence contained in the record to support a finding of adequate cause based on any of the grounds raised. The University filed its appeal.

## II.  ISSUES PRESENTED

The University has presented the following issues on appeal, which we have slightly reframed:

1. Whether the chancery court erred in concluding that the University failed to establish adequate cause for terminating Profession Nordbye based on a capricious disregard of accepted standards of professional conduct pursuant to Tennessee Code Annotated section 49-8-302(5).
2. Whether the chancery court erred in concluding that President Rudd lacked the authority to make an adequate-cause determination.

For the following reasons, the judgment of the chancery court is reversed and remanded.

## III.  DISCUSSION

### A.  Standards Applicable to Tenure Termination Proceedings

We begin by describing the basic procedures of the termination proceedings at issue, as well as the applicable standard of review. Tennessee law provides for the establishment of "a state university and community college system," which is composed of several member universities, community colleges, and state colleges of applied technology. Tenn.

Code Ann. § 49-8-101(a)(1).  The University is a member of this "board of regents" system.  Tenn. Code Ann. § 49-8-101(a)(2)(A).  The system provides for termination of tenured faculty members based on "adequate cause" and sets forth certain minimum procedures to be put in place by member institutions to ensure due process for the faculty member whose termination is sought.[5]  Tenn. Code Ann. §§ 49-8-302–303.  When a faculty member employed at a member university is terminated for "adequate cause," such cause must be supported by "clear and convincing evidence in the record considered as a whole[.]"  Tenn. Code Ann. § 49-8-303(a)(4).  In order for evidence to be clear and convincing, it "must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence."  *Stephens v. Roane State Cmty. Coll.*, No. M2001-03155-COA-R3-CV, 2003 WL 21918758, at *8 (Tenn. Ct. App. Aug. 12, 2003) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995), *superseded by statute on other grounds*, Tenn. Code Ann. § 36-1-113(g)).  "Such evidence should produce in the mind of the fact-finder a firm belief or conviction as to the truth of the allegations sought to be established."  *Id.* (citing *O'Daniel*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985)).

According to both the procedures required by Tennessee Code Annotated section 49-8-303, and those set out in the handbook, a tenured faculty member whose termination is sought based on adequate cause must be notified of the charges in writing and provided an administrative hearing in which he or she may be represented by counsel.  Tenn. Code Ann. § 49-8-303(a)(1)-(2).  Both sides are permitted to submit evidence and to examine and cross-examine witnesses.  Tenn. Code Ann. § 49-8-303(a)(5).  The statute also permits the member institution to promulgate additional procedures deemed necessary and "may provide for review of the decision by the board or its designee based upon the record."  Tenn. Code Ann. § 49-8-303(b).  The handbook requires the panel to generate a "committee report" in which it makes findings of fact and "shall state whether the committee has determined that adequate cause for termination exists, and if so, the specific grounds for termination found."  The handbook then requires the president to review the panel's report and the record, and "[f]ollowing his or her review, the president shall notify the faculty member of his/her decision, which, if contrary to the committee's recommendation shall be accompanied by a statement of the reasons."  If the faculty member is terminated or suspended, he or she may then appeal "the president's action" to the chancery court pursuant to Tennessee Code Annotated section 49-8-304(a).  The chancery court conducts a *de novo* review of the record to determine whether clear and convincing evidence of adequate cause is contained in the record.  Tenn. Code Ann. § 49-8-304(a).  Further, the chancery court "may permit introduction of any and all evidence which [it] deems necessary to enable [it] to dispose of the issues presented." *Frye v. Memphis State Univ.*,

---

[5] Adequate cause is not the sole basis for termination of a tenured faculty member available to member institutions.  Tenn. Code Ann. § 49-8-301(b)(3).  It is, however, the sole basis for termination that the University relies on in this appeal.

671 S.W.2d 467, 469 (Tenn. 1984).

As the chancery court "reviews the case without a jury, our scope of review is set forth in Tenn. R. App. P. 13(d), which directs that we make a *de novo* review of the trial court's findings of fact, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Notably, "appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because the trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). However, this level of deference is not given "to a trial court's findings of fact [that are] based on documentary evidence such as depositions, transcripts, or video recordings." *Id.* at 693. (citing *Mitchell v. Fayetteville Pub. Utils.*, 368 S.W.3d 442, 448 (Tenn. 2012); *Orrick v. Bestway Trucking, Inc.*, 184 S.W.3d 211, 216 (Tenn. 2006); *Binette*, 33 S.W.3d at 217)). Rather, "when factual findings are based on documentary evidence, an appellate court may draw its own conclusions with regard to the weight and credibility to be afforded that documentary evidence." *Id.* (citing *Excel Polymers, LLC v. Broyles*, 302 S.W.3d 268, 271 (Tenn. 2009); *Bohanan v. City of Knoxville*, 136 S.W.3d 621, 624 (Tenn. 2004)). We review any questions of law which may arise *de novo* without a presumption of correctness. *Wells*, 9 S.W.3d at 783. Additionally, "[w]hether the evidence is clear and convincing is a question of law that appellate courts review *de novo* without a presumption of correctness." *Kelly*, 445 S.W.3d at 693 (citing *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013)).

### B. *Authority of the University's President to Make an Adequate Cause Determination*

Though this issue is listed second in the University's brief, we address it first on appeal as Professor Nordbye claims that if President Rudd lacked the authority to override the panel's decision, his termination is void. This issue pertains to the chancery court's determination that "President Rudd's removal of Nordbye was not based upon the findings of fact by the President's Panel majority which [were findings] in favor of Petitioner Nordbye." Essentially, the chancery court determined that the faculty handbook left the president unable to make a decision contrary to the one listed by the panel majority in its report. The chancery court seems to have interpreted the president's role as essentially a "tiebreaker" as it noted that it did not reach a conclusion as to what result would occur had the panel resulted a "2 to 2 decision." The University claims that this was a misinterpretation of the terms of the handbook. The University asserts that the handbook "unambiguously assigns that review authority to the University President and makes him the final decision-maker with respect to the termination of tenured faculty [ ] and it expressly contemplates the President making his own decision contrary to the hearing committee's recommendation[.]" Professor Nordbye claims that the chancery court correctly interpreted the terms of the handbook, and President Rudd was not permitted to

- 22 -

make a decision contrary to that of the panel. Additionally, Professor Nordbye claims that President Rudd acted improperly by considering information not contained in the administrative record when making his decision and by failing to adequately set out the facts supporting his decision.

The disposal of this issue is predicated solely on the terms of the handbook. The handbook provides in relevant part:

> 8. A hearing shall be conducted by the hearing committee (President's Panel) to determine whether adequate cause for termination of the faculty member exists. The hearing shall be conducted according to the procedures below.
>
>    . . .
>
>> h. The findings of fact and the report [of the President's Panel] will be based solely on the hearing record.
>>
>> i. The president and the faculty member will be provided a copy of the written committee report. The committee's written report shall specify findings of fact and shall state whether the committee has determined that adequate cause for termination exists and, if so, the specific grounds for termination found. In addition, the committee may recommend action less than dismissal. The report shall also specify any applicable policy the committee considered.
>
> 9. After consideration of the committee's report and the record, the president may in his/her discretion consult with the faculty member prior to reaching a final decision regarding termination. Following his/her review, the president shall notify the faculty member of his/her decision, which, if contrary to the committee's recommendation, shall be accompanied by a statement of the reasons.

The plain language of the handbook clearly provides authority for the president to make a decision regarding termination that is different from that of the President's Panel. This is confirmed by the statement that the president is permitted to consult with the faculty member "prior to reaching a final decision regarding termination." If the president was not permitted to make a decision contrary to that of the panel, there would be no need for language referencing either consultation of the faculty member or stating the president is to actually make such a decision. Further, the handbook provides explicitly for what is to occur if the president's decision is "contrary to the committee's recommendation." We agree with the University that the chancery court misinterpreted the handbook. There is no language in the handbook limiting the president's authority to find that adequate cause exists only when the panel has initially made that finding. Rather, the language is broad

and describes the President's act making a "final decision regarding termination."  It would be incongruous to characterize the President's authority as that to make a "final decision" without also granting him or her the authority to override the decision of the panel as to whether the facts contained in the record constitute a basis for termination.  Further, this reading of the handbook is supported by the testimony of Dr. Nenon, the University's provost, who stated that the ability to override the decision of the panel would be consistent with the president's "ultimate responsibility for the management of the University," a responsibility that "he did not delegate [ ] and cannot delegate [ ] to a faculty panel."

Further, while not binding on the terms of the handbook itself, we find it notable that the panel and counsel for both the University and Professor Nordbye appear to have agreed during the initial administrative hearing that the president's decision was the final decision that could then be reviewed by the chancery court.  Additionally, the report itself is titled, "The President's Panel Recommendation."  Both the majority and minority reports state what action they "recommend[ed]" the president take.  Therefore, pursuant to the explicit terms of the faculty handbook, we find that President Rudd was not bound by the determination of the President's Panel and was permitted to issue his own "final decision regarding termination" after reviewing the panel's report and the administrative record.

However, as to Professor Nordbye's concerns regarding President Rudd's apparent decision to consider matters outside of the administrative record, we agree that this was improper.  The faculty handbook states that the panel's "findings of fact and [ ] report will be based solely on the hearing record."  The handbook goes on to state that the president is to consider "the committee's report and the record," at which point he or she may proceed to consultation with the faculty member and then come to a final decision regarding termination.

President Rudd's written termination letter does not cite any events not contained in the administrative record, but nor does it contain a recitation of the specific facts driving his decision.  Rather, the letter gives an outline of the charges levied against Professor Nordbye and goes on to state that "there [was] evidence from faculty, staff, students, colleagues and supervisors that show[ed] a pattern of unacceptable conduct, belligerence, insubordination, and continued and deliberate failures to perform the duties and responsibilities of [his] position."  However, Dr. Nenon, speaking on behalf of President Rudd during his deposition, acknowledged that President Rudd was "aware of many more things than the panel apparently became aware of."  When asked whether those incidents had been taken into account, he responded that President Rudd had considered "the full range of knowledge of all the things he had."  Therefore, it appears that incidents not set forth in the administrative record weighed on President Rudd's decision.  However, it is not necessary for this Court to determine to what extent, if any, those incidents affected President Rudd's decision.  These proceedings were subject to *de novo* review by the chancery court, which cures such procedural irregularities.  *See Wells*, 9 S.W.3d at 787; *Phillips v. State Bd. of Regents of State Univ. & Cmty. Coll. Sys. of State of Tenn.*, 863

S.W.2d 45, 50 (Tenn. 1993); *Frye*, 671 S.W.2d at 469. President Rudd's decision was not given deference, and the chancery court's decision was predicated solely on the record presented. Further, other evidence brought forth during the chancery proceedings was excluded. The chancery court specifically excluded testimony from Dr. Lou that pertained to matters which occurred after the issuance of the termination letter and refused to consider such events. Therefore, any procedural error that may have occurred during President Rudd's review was cured by *de novo* review in the chancery court.

### C. Sufficiency of the Evidence

Having concluded that President Rudd had authority to override the decision of the President's Panel and that *de novo* review by the chancery court cured any procedural irregularities, we now consider whether the record contains clear and convincing evidence of adequate cause to terminate Professor Nordbye. Notably, the chancery court ruled on three grounds for adequate cause: (1) willful failure to perform the duties and responsibilities for which the faculty member was employed . . . , (2) capricious disregard of accepted standards of professional conduct, and (3) failure to maintain the level of professional excellence and ability demonstrated by other members of the faculty in the department. *See* Tenn. Code Ann. § 49-8-302. However, on appeal, the University has challenged only the chancery court's determination that there was not clear and convincing evidence establishing Professor Nordbye acted with a capricious disregard of accepted standards of professional conduct. Therefore, we will review the record only to determine whether clear and convincing evidence of this ground for termination existed.

The University does not appear to dispute any of the trial court's factual findings. Rather, it contends that the trial court erred by holding those factual findings did not amount to clear and convincing evidence of a capricious disregard of accepted standards of professional conduct. The University argues that the chancery court erred by weighing each incident "in isolation" when it was required to "consider the record 'as a whole' in accordance with Tenn. Code Ann. § 49-8-303(a)(4)." The University contends that when weighing these incidents together, they demonstrate that adequate cause for Professor Nordbye's termination existed. *See McClellan v. Bd. of Regents of State Univ.*, 921 S.W.2d 684, 692 (Tenn. 1996) (stating in the context of an adequate cause case predicated on sexual harassment that "conduct may be actionable because of frequency or gravity"). We agree.

The phrase "capricious disregard of accepted standards of professional conduct" is not defined in the statute or the handbook. However, we do have case law interpreting this ground for termination that is instructive. In *Phillips*, a member of the Board of Regents system sought to terminate an employee for capricious disregard of accepted standards of professional conduct. *Phillips*, 863 S.W.2d at 48. Our Supreme Court summarily held that the proof was "overwhelming" that the professor had engaged in behavior constituting this ground for termination. *Id.* The termination notice issued to the employee alleged that the following conduct constituted a capricious disregard for the standards of professional

conduct: (1) a lack of compassion and insensitivity to student needs, (2) poor judgment and inflexibility in administering classroom policies, (3) a lack of professional behavior towards peers, administrators, and staff, (4) an inability to recognize personal weaknesses affecting communication and decisions, (5) insubordination to supervisors, (6) continuous increasing patterns of controversy with other professional areas at the college, and (7) an unwillingness to modify behavior after being notified of problem areas and consequences. *Id.* at 48. In *Wells*, our Supreme Court clarified that "[t]he *Phillips* case clearly illustrates that the behavior of tenured faculty toward staff, colleagues and superiors, as well as toward students, can constitute 'capricious disregard' within the meaning of Tenn. Code Ann. § 49-8-302(5) (1996 Repl.)." *Wells*, 9 S.W.3d at 786.[6] Many of Professor Nordbye's behaviors that are identified in the charging documents fall into these same categories.

Notably, the *Wells* court ultimately determined that the evidence contained in the record presented did not warrant reversal of the chancery court's decision that adequate cause had not been proven by clear and convincing evidence. *Id.* at 788. The Court did so due to certain factual findings made by the chancery court after hearing live testimony elicited during the proceedings before it. *Id.* Because those proceedings took place in chancery court, the chancellor's assessment of the testimony was entitled to a presumption of correctness. *Id.* at 783-84. Conversely, here, the vast majority of the evidence at issue is documentary evidence, and therefore, we are not bound by the same constraint. *Id.*

Professor Nordbye's interactions with his students and peers certainly support a charge of a capricious disregard for the accepted standards of professional conduct. Evidence concerning Professor Nordbye's relationships with two independent study students demonstrates a lack of professional behavior that resulted in Professor Lou taking over the study of one student, and the other withdrawing from the course. While the chancery court appears to have found that the email to the first student was not the threat Professor Lou took it to be, his inability to work with the student and decision to blame the student for issues that arose support this ground for termination. Professor Lou specifically stated that Professor Nordbye's "blaming" of the student constituted a "sort of inappropriateness" for an independent study instructor. He also testified that the student was "cooperative" when he took over the course. As to the second independent study student, Professor Lou noted that other professors within the department were deeply concerned about how the student had been treated and even recommended that the student file a grievance. Likewise, Professor Nordbye sent disrespectful emails to members of faculty, even going as far as to tell one member of the art department, "[p]lease retire." Similarly, after being asked to author a description of the foundations program for the University's website, Professor Nordbye circulated a "fake joke copy" to Professor Lou full of criticisms of the art department as well as self-aggrandizing statements. Simultaneously, he failed to follow instructions by "by-pass[ing]" Professor Lou and

---

[6] We do not believe the Supreme Court intended for this list to be comprehensive, but the types of conduct listed largely cover the types of conduct leading to Professor Nordbye's termination.

sending the description directly to the web administrator. Additionally, Professor Nordbye was disrespectful to a colleague during a spontaneous fire drill and refused to adhere to her requests to move away from the building despite the presence of students. The chancery court seems to have found this incident did not constitute adequate cause due to a lack of proof that Professor Nordbye had been previously instructed on the proper area to move to in the case of a fire. However, this completely disregards its own finding that he "was rude and defiant" to the faculty member and "instructed students to disregard the faculty member's order." His knowledge of the appropriate location is frankly irrelevant. Regardless of whether he knew the proper location at which to congregate, he was openly "rude and defiant" toward his colleague and undermined her in front of students. Likewise, the comments in Professor Nordbye's SETE evaluations and those elicited by Professor Lou during his meetings are riddled with criticisms regarding his interactions with students. Many commented on his overly harsh and arbitrary criticisms. One SETE comment noted that "[g]irls cried" and Professor Nordbye "belittle[ed] . . . students whenever they disagree[d] with [him]." Another noted that it often took several class periods to complete critiques and that Professor Nordbye could "be insensitive and quite rude at times." The student also noted that he or she felt compelled to make "artwork for the professor instead of exploring what [he or she] wanted to make" because "he was more harsh on your grade" if the artwork was not within his interest. Another student stated that "critiques were terrible" and Professor Nordbye "didn't even get to everyone." The student went on to say that students "made projects only to please his weird idea of art" because "[t]hey were scared of being put down in front of their classmates." The student also noted that "[h]e would say really rude [and] hurtful things[.]" The trial court seems to have discounted these comments because they were not direct testimony, noting on multiple occasions that "[t]he University did not call in one single student to testify." However, pursuant to the handbook, the committee was not constrained by the normal rules of evidence. Additionally, no evidence contained in the record demonstrates that the SETE comments were unreliable and as this is documentary evidence, we are permitted to assign it more weight than the chancery court despite its concerns. *See Kelly*, 445 S.W.3d at 692. Further, while the chancery court notes that some positive comments were contained in the record, the record contains more negative student feedback than positive.

The record also contained evidence of several additional inappropriate and unprofessional interactions between Professor Nordbye and students. Professor Nordbye was involved in not one, but two such incidents in the on-campus Subway restaurant. The first involved Professor Nordbye shouting at students in line to "stop eating Subway" and bring food from home. Professor Nordbye was then confronted by an employee but claimed that he could do what he wanted. While Professor Nordbye testified extensively about his attempt to reform the campus food systems, he never denied the confrontation or attempted to explain the incident. Later, Professor Nordbye engaged in a shouting match with a student in the restaurant that required Professor Lou to intervene. Additionally, one student and Professor Nordbye himself reported his use of the "N" word during a class discussion. Professor Lou explained during his testimony that such language can certainly

be used to accomplish goals in an educational setting, but that using it for "shock" value and without establishing the proper educational context left its use wholly inappropriate. Professor Nordbye did not address this incident in his testimony. These verbal confrontations with students and on-campus workers clearly support the charge of a capricious disregard for the standards of professional conduct.

It is also notable that Professor Lou and Dr. Schmidt consistently informed Professor Nordbye that these types of interactions were unacceptable, but Professor Nordbye did not change his behavior. In *Phillips*, our Supreme Court considered the employee's unwillingness to modify behavior after being notified of certain issues as a type of behavior constituting a capricious disregard for the standards of professional conduct. *Phillips*, 863 S.W.2d at 48. Here, Professor Nordbye acknowledged that his behavior was out of line. Regardless, he often responded to Professor Lou's attempts at correction with contempt and sarcasm. Meanwhile, the University took steps to help Professor Nordbye overcome his issues through the implementation of a performance improvement plan and by assigning him a faculty mentor, which itself was an unprecedented attempt at correction. While Professor Nordbye did comply with some portions of the plan involving the use of rubrics and syllabi, he failed to internalize the lessons pertaining to etiquette with peers and students. Professor Nordbye did agree to reduce his committee work and "rein in [his] impulsivity in the classroom" in his response to his May 2016 faculty evaluation, but he later failed to do so. While Professor Lou did assign him to certain committees, he explained that these were necessary for Professor Nordbye as one was a search committee for a professor he would supervise and the other involved his expertise in modern art. Meanwhile, Professor Nordbye attempted to "decline" an order to stop serving on certain committees. He later attempted to form a completely new committee. Additionally, Professor Nordbye accepted commissions to paint murals despite having already been informed that "he needed to not take on giant tasks" in order to focus on "his . . . primary mission, which [was] to teach courses effectively." He did not adequately engage in Dr. Schmidt's attempts to help him, failing to send him emails for review, and failing to complete exercises prior to meetings. Professor Schmidt also noted that Professor Nordbye failed to manage all of his obligations and took on additional projects such as murals despite it leaving him without adequate time to manage his coordinator responsibilities. Professor Nordbye spent much of his time with Dr. Schmidt expressing anger and resentment towards Professor Lou. This led Dr. Schmidt to warn Professor Lou and advise him not to meet with Professor Nordbye alone. Additionally, Dr. Schmidt reprimanded Professor Nordbye for constantly arguing with Professor Lou, but he continued to do so. This eventually led Dr. Schmidt to determine that he could not help Professor Nordbye and to resign from his position as faculty mentor. Professor Nordbye's consistent failure and refusal to accept correction supports the charge that he exhibited a capricious disregard for the standards of professional conduct as it clearly demonstrates a lack of proper respect for the standards espoused by his direct superior and faculty mentor.

Moreover, the record is rife with evidence of Professor Nordbye simply failing to

perform his duties in accordance with the proper regard for the standards of professional conduct. Professor Nordbye missed multiple faculty and department meetings. Professor Nordbye even missed a meeting scheduled to discuss his faculty evaluation in the wake of the incident involving the second arrest warrant because he overslept. When the other meeting participants called him, he responded angrily by yelling and eventually ended the call. Professor Nordbye also failed to timely hire staff for a foundations level course. This created "turmoil" within the art department and once resulted in a section of students attending a class in which no professor was assigned. Professor Lou was then required to hire an instructor for that course. Professor Nordbye even failed to recruit models for students in his drawing class, and when confronted, blamed the graduate student to whom he had assigned the task. In our view, failure to perform these basic tasks in a professional manner also supports the charge of capricious disregard for the standards of professional conduct. This conduct was unexpected of a foundations coordinator, and Professor Nordbye's failure to address these issues in a timely manner demonstrates a lack of respect and consideration for his duties.

Several other incidents also demonstrate a capricious disregard for accepted standards of professional conduct. While it appears that the use of deceased animals as models for art students is common practice in the art department, it does not excuse Professor Nordbye's behavior. Professor Nordbye did not follow the proper protocol employed to bring such items into a classroom. Regardless, Professor Nordbye's response to being informed that this was an issue was more concerning. He refused to listen when University officials attempted to explain that this type of behavior violated school policy. Professor Lou even testified that it was not the act of bringing the remains into the classroom, but rather the failure to follow the proper protocol and the "great effort . . . to get him to agree to comply to our policies" that caused issues. The trial court's consideration of this issue ignored this point and focused only on the general practice of using human and animal remains as models. It characterized Professor Nordbye's response to this issue as "agree[ing] to comply with protocols." The order cites only Professor Lou's testimony as support for its interpretation of Professor Nordbye's response. However, the record reflects that Professor Lou stated "it took a great deal of effort" to convince Professor Nordbye to comply with the policy, as he argued that "because he had put [the remains] in a condom" it did not pose a safety issue. Professor Lou further described Professor Nordbye's response as a "flippant and belligerent back and forth." This response certainly supports the University's charge of adequate cause, as it demonstrates the failure of Professor Nordbye to treat his direct superior and the policies of the University with proper respect and also displays his impulsive behavior.

Professor Nordbye's response to the issuance of the second warrant for his arrest also supports the charge of capricious disregard. Notably, we do not assign any weight to his behavior related to the first incident in which he was arrested during class. He was unaware that a warrant existed, and there is no evidence of what led to the arrest other than his statements that he was charged for domestic assault, and the charge was later dismissed.

The charges did not involve professional conduct, and he worked with Professor Lou to resolve the issues. However, his actions following the issuance of the second arrest warrant certainly support the charge of capricious disregard. Professor Nordbye not only taught his class while aware of the warrant's existence, but he also told the class the warrant existed. Professor Nordbye stated that he did so to manage the emotional environment of the class but did not explain how informing the class of the warrant's existence led them to be calmer or more emotionally regulated. Further, he argued with Professor Lou about the assignment of substitute professors, stating he would attend and "co-teach" rather than let a substitute teach. This led to the classes being cancelled altogether. Afterward, Professor Nordbye had yet another unprofessional interaction with a student distributing stickers. Rather than going through the proper channels to file a grievance, Professor Nordbye used his university email address to make a legal threat against the student. Professor Nordbye was reprimanded for this incident and admitted that he understood why it was problematic as "there could be a voice of authority" associated with a university email address. Additionally, Professor Nordbye removed a sink from his classroom wall without proper authorization. Despite his attempts to demonstrate that he was qualified to do so and claims that other professors had made physical alterations to the art building, Professor Nordbye did not demonstrate that he either obtained permission beforehand or was not required to do so. Professor Lou and Dr. Weddle-West both testified that Professor Nordbye had been instructed to abstain from doing such things prior to this incident. In fact, Professor Nordbye stated in an email he "knew that [he] was crossing a boundary with the sink thing" and understood why it resulted in Professor Lou becoming concerned.

This evidence clearly and convincingly demonstrates a capricious disregard for the standards of professional conduct applicable to a tenured professor within the board of regents system. Notably, the chancery court did not find that these incidents did not occur, but rather analyzed the incidents one-by-one and in isolation or in a few cases found that the evidence was not convincing. Our analysis differs in that we considered the record "as a whole" in accordance with Tennessee Code Annotated section 49-8-303(4) and, as explained above, gave greater weight to certain evidence such as the comments contained in student SETE reports. When considered in isolation, many of these incidents may not rise to the level of capricious disregard necessary to constitute adequate cause for termination, but certainly, when considering their frequency, they amount to a capricious disregard for the standards of professional conduct. *See McClellan*, 921 S.W.2d at 692. Additionally, the chancery court appears to have considered that Professor Nordbye was placed on a three-year performance improvement plan but was terminated prior to its completion when assessing this ground. However, the completion of this plan was not required for termination pursuant to this ground for adequate cause pursuant to the handbook and was therefore irrelevant to our analysis of this ground.[7] Notably, several

_____

[7] The grounds of incompetence or dishonesty in teaching or research and failure to maintain the level of professional excellence and ability demonstrated by other members of the faculty in the department or division of the university do require the "fulfillment of the Post Tenure Evaluation and Faculty

incidents which clearly support the charge of capricious disregard were not considered in the trial court's analysis. Neither incident that took place in the on-campus Subway restaurant was mentioned in its analysis. As stated above, both were interactions that demonstrated a failure to treat others with proper respect and a disregard of the standards of professional conduct. Similarly, the chancery court did not reference the email asking another faculty member to "[p]lease retire" or his sarcastic responses when reprimanded by Professor Lou. Likewise, the chancery court made no reference to Professor Nordbye's use of the "N" word in class without the proper educational context. Each of these incidents certainly supported this ground for termination.

Considering the record as a whole, we hold that there is clear and convincing evidence illustrating Professor Nordbye engaged in a capricious disregard for the standards of professional conduct applicable to a tenured college professor, and there was adequate cause for his termination.[8] For years, Professor Nordbye disrespected students and faculty and took actions flouting the standards of professional conduct. Attempts were made to correct his behavior, but he failed to improve and often responded sarcastically or flippantly. For these reasons, we reverse the decision of the chancery court.

## IV. CONCLUSION

For the foregoing reasons, we reverse the decision of the chancery court and remand for entry of an order consistent with this opinion. Costs of this appeal are taxed to the appellee, Cedar Nordbye, for which execution may issue if necessary.

s/ Carma Dennis McGee
CARMA DENNIS MCGEE, JUDGE

---

Development" pursuant to the handbook.

[8] Notably, we did not consider Professor Nordbye's actions of silk-screening statements onto walls and doors and hanging of silk-screened images in department buildings. To do so might require this Court to assess whether those acts fell within areas of protected speech or academic freedom as the trial court found the firearm images were "art" and part of Professor Nordbye's "long history of anti-violence art." Given the overwhelming nature of the remainder of the evidence in the record, it is not necessary for us to consider his arguments in this regard.